**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BAONGOC T. VO, derivatively on behalf of C3.AI, INC., <br><br> Plaintiff, <br><br> v. <br><br> THOMAS M. SIEBEL, PATRICIA A. HOUSE, LISA A. DAVIS, RICHARD LEVIN, MICHAEL G. MCCAFFERY, CONDOLEEZZA RICE, S. SHANKAR SASTRY, BRUCE SEWELL, JIM H. SNABE, STEPHEN M. WARD JR., EDWARD Y. ABBO, DAVID BARTER, HOUMAN BEHZADI, BRUCE CLEVELAND, and BRADY MICKELSEN, <br><br> Defendants, <br> -and- <br><br> C3.AI, INC., <br><br> Nominal Defendant. | C.A. No. <br><br> JURY TRIAL DEMANDED <br><br> **REDACTED PUBLIC VERSION** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff BaoNgoc T. Vo ("**Plaintiff**"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant C3.ai, Inc. ("**C3**" or the "**Company**"), submits this Verified Stockholder Derivative Complaint (the "**Complaint**") against the individual defendants for breach of fiduciary duty, violations of the securities laws, and unjust enrichment. Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis of her counsel, as to all other matters. The investigation of Plaintiff's counsel included a review of matters of public record, filings by C3 with the U.S. Securities and Exchange Commission ("**SEC**"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and the review of books and records produced by the Company in response to Plaintiff's demand under

8 *Del. C.* § 220 ("**Section 220**"). All such books and records produced prior to the filing of this Complaint are expressly incorporated by reference herein. For the avoidance of doubt, this incorporation by reference does not change the pleading standard applicable to any motion to dismiss that may be filed in this case.

## NATURE AND SUMMARY OF THE ACTION

1.      C3 is an enterprise artificial intelligence ("**AI**") software provider that offers a variety of software-as-a-service ("**Saas**") applications for enterprises and software solutions, as well as integrated turnkey enterprise AI applications for oil and gas, chemicals, utilities, manufacturing, financial services, defense, intelligence, aerospace, healthcare, and telecommunications market segments.

2.      The Company claims to have strategic partnerships with industry leaders in many of these segments. C3 highlights its partnership with Baker Hughes—one of the world's largest oil field services companies—in the oil and gas segment. Until December 1, 2021, the Company represented that it had access to and was leveraging Baker Hughes' extensive marketing, sales, and services resources, including Baker Hughes' "12,000-person sales organization."

3.      Because C3's salesforce was critical to its success, the Company used its purported strategic partnership with Baker Hughes, as well as repeated references to Baker Hughes' substantial salesforce, to convince potential investors that the Company could execute on its growth plan.

4.      In reality, however, C3 did not have access to Baker Hughes' traditional salesforce. Instead, C3 and Baker Hughes had created a separate unit outside of their normal structure ("**Baker Hughes C3**"), which handled sales of C3 products. Given that this unit was staffed with salespeople who lacked the industry expertise and connections of Baker Hughes' normal

salesforce, it failed to make any sales in the fiscal year ending April 30, 2020.

5.     Moreover, from at least December 9, 2020 through February 16, 2022 (the "**Relevant Period**"), Defendants caused the Company to make false and/or misleading statements and/or fail to disclose, *inter alia*, that: (i) the Company's partnership with Baker Hughes was deteriorating; (ii) the Company faced significant salesforce turnover; (iv) the Company overstated, among other things, its total addressable market ("**TAM**"), the pace of its market growth, and the scale of alliances with its major business partners; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.     In December 2021, the Company began to reveal the truth to investors. For example, on December 1, 2021, the Company's CEO, defendant Thomas Siebel, revealed that C3 had secretly reorganized its direct salesforce in July 2021, only to restructure it again in the last month of the quarter.

7.     C3 also revealed in December 2021 that it had "significantly expanded and restructured its strategic relationship with Baker Hughes for the second time... The newly expanded contract also introduced a new pricing model and selling structure designed to further accelerate sales of C3 AI software products into the Baker Hughes customer base." It was only when an analyst asked about the motivations for this restructuring that Defendant Siebel revealed that Baker Hughes and C3 had formed Baker Hughes C3 to sell the Company's products and services in the oil and gas market, rather than utilizing Baker Hughes' 12,000-person expert salesforce as the Company had previously claimed.

8.     Finally, on February 16, 2022, Spruce Point Capital Management ("**Spruce Point**") issued a report and strong sell research opinion regarding the Company (the "**Spruce Point Report**"). The Spruce Point Report detailed: (i) evidence of a severely challenged partnership with

Baker Hughes; (ii) significant salesforce turnover; (iii) evidence of exaggerated or irreconcilable claims made by C3 regarding, *inter alia*, the scale of the Company's alliance with strategic partners such as Microsoft, Google Cloud, Intel, and Amazon Web Services; and (iv) insider enrichment.

9.      Following publication of the Spruce Point Report, the Company's stock price dropped $1.01 per share (nearly 4%) to close at $24.70 per share on February 16, 2022.

10.      Meanwhile, because the Company's registration statement contained an unusual lockup provision allowing certain C3 executives and other insiders to sell their shares after 90 days (rather than the typical 180 days), several insiders sold shares of C3 stock at artificially inflated prices based on their knowledge of material, non-public information ("**MNPI**"), collectively reaping more than $650 million in proceeds before the Company's share price plummeted as the truth about the Company was revealed.

11.      As detailed herein, and as alleged in the ongoing federal securities class action in the Northern District of California styled *The Reckstein Family Trust, et al. v. C3.ai, Inc., et al.*, No. 4:22-cv-01413-HSG (the "**Federal Securities Class Action**"), several of C3's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.      This derivative action is not a collusive action to confer jurisdiction on a court of

the United States that would not otherwise have such jurisdiction.

14.     Venue is proper in this District because the Company is incorporated in this District and the Company and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District.

<u>**THE PARTIES**</u>

*Plaintiff*

15.     Plaintiff is and has continuously been a stockholder of C3 during the wrongdoing complained of herein.

*Nominal Defendant*

16.     Nominal Defendant C3 is a Delaware corporation with principal executive offices located at 1300 Seaport Boulevard, Suite 500, Redwood City, California 94063. The Company's Class A common stock trades on the NYSE under the ticker symbol "AI."

*Director Defendants*

17.     Defendant Thomas M. Seibel ("**Siebel**") co-founded C3 in 2009 and has served as Chairman of the Company's Board of Directors ("**Board**") since January 2009. He has also served as C3's Chief Executive Officer ("**CEO**") since July 2011. Between March 2021 and November 2021, Siebel sold millions of shares of C3 stock on the basis of MNPI, reaping proceeds of over $600 million. Indeed, Defendant Siebel began selling shares as early as March 8, 2021—just three months after the IPO and much earlier than the 180-day lock-up period initially specified.

18.     Defendant Patricia A. House ("**House**") co-founded C3 with Defendant Siebel in 2009 and served as the Vice Chairman of the Board from September 2009 until February 24, 2023. She also served as a member of the Compensation Committee. In March, June, and September 2021, House sold shares of C3 stock on the basis of MNPI, reaping proceeds of over $30.5 million.

19. Defendant Lisa A. Davis ("**Davis**") has served as a member of the Board since December 2021. She is also a member of the Audit Committee.

20. Defendant Richard Levin ("**Levin**") has served as a member of the Board since August 2010. He is also a member of the Audit Committee. In March and June 2021, Levin made sales of C3 stock on the basis of MNPI, reaping proceeds of more than $11 million.

21. Defendant Michael G. McCaffery ("**McCaffery**") has served as a member of the Board since March 2009. He is also Chairman of the Audit Committee and a member of the Nominating and Corporate Governance Committee. In March 2021, McCaffery sold hundreds of thousands of shares of C3 stock on the basis of MNPI, reaping proceeds of more than $16.5 million.

22. Defendant Condoleezza Rice ("**Rice**") has served as a member of the Board since December 2009. In March and June 2021, Rice sold shares of C3 stock on the basis of MNPI, reaping nearly $10 million in proceeds.

23. Defendant S. Shankar Sastry ("**Sastry**") served as a member of the Board from January 2009 until February 27, 2023. In April 2021, Sastry sold shares of C3 stock on the basis of MNPI, reaping over $3 million in proceeds.

24. Defendant Bruce Sewell ("**Sewell**") has served as a member of the Board since May 2017. He is also a member of the Compensation Committee and Chair of the Nominating and Corporate Governance Committee. In March 2021, Sewell sold shares of C3 stock on the basis of MNPI, reaping more than $3 million in proceeds.

25. Defendant Jim H. Snabe ("**Snabe**") has served as a member of the Board since February 2021.

26. Defendant Stephen M. Ward, Jr. ("**Ward**") has served as a member of the Board since January 2009. He is also Chair of the Compensation Committee and a member of the

Nominating and Corporate Governance Committee. In March, June, and July 2021, Ward sold shares of C3 stock on the basis of MNPI, reaping more than $16 million in proceeds.

27.     Defendants Siebel, House, Davis, Levin, McCaffery, Rice, Sastry, Sewell, Snabe, and Ward are referred to herein as the "**Director Defendants**."

*Officer Defendants*

28.     Defendant Edward Y. Abbo ("**Abbo**") has served as the Company's Chief Technology Officer since July 2011. He previously served as the Company's CEO from September 2009 until July 2011 and as a member of the Board from August 2009 until November 2020. Between March 2021 and November 2021, Abbo sold hundreds of thousands of shares of C3 stock on the basis of MNPI, reaping more than $45 million in proceeds. Like Defendant Siebel, Defendant Abbo also began selling stock before the 180-day lock-up period had expired.

29.     Defendant David Barter ("**Barter**") served as the Company's Chief Financial Officer ("**CFO**") from October 2020 until December 11, 2021. In October and November 2021, Barter sold shares of C3 stock on the basis of MNPI, reaping proceeds of more than $8 million.

30.     Defendant Houman Behzadi ("**Behzadi**") has served as the Company's Chief Product Officer since October 2016. From January 2010 to July 2012, Behzadi served as the Company's Vice President of Engineering. From July 2012 to October 2016, Behzadi served as the Company's Senior Vice President of Products and Engineering. Between March 2021 and November 2021, Behzadi sold shares of C3 stock on the basis of MNPI, reaping more than $31 million in proceeds.

31.     Defendant Bruce Cleveland ("**Cleveland**") served as the Company's Chief Marketing Officer from November 2019 until October 2021. Prior to serving in that role, Cleveland had served as an advisor to the Company since January 2009. In March, June, and

September 2021, Cleveland sold shares of C3 stock on the basis of MNPI, reaping proceeds of more than $9 million.

32.     Defendant Brady Mickelsen ("**Mickelsen**") served as the Company's General Counsel from August 2019 until November 2021 and now serves as an advisor to the Company. In March 2021, Mickelsen sold shares of C3 stock on the basis of MNPI, reaping proceeds of more than $2.5 million.

33.     Defendants Abbo, Barter, Behzadi, Cleveland, and Mickelsen are referred to herein as the "**Officer Defendants**." The Director Defendants and the Officer Defendants are collectively referred to herein as the "**Individual Defendants**."

34.     Defendants Siebel, House, Levin, McCaffery, Rice, Sastry, Sewell, Ward, Abbo, Behzadi, Cleveland, Mickelsen, and Barter, who traded shares of C3 common stock on the basis of MNPI, are referred to herein as the "**Insiders**."

## SUBSTANTIVE ALLEGATIONS

35.     On November 13, 2020, in connection with its initial public offering ("**IPO**"), the Company filed a Registration Statement on Form S-1 with the SEC. Following the issuance of multiple amendments, the SEC declared the Registration Statement effective on December 8, 2020. That same day, the Company priced its stock at $42 per share, with trading expected to begin on December 9, 2020. According to a press release issued by the Company, C3 expected to raise $651 million through the issuance of 15.5 million shares, excluding any exercises of the underwriters' option to purchase additional shares.

36.     On December 9, 2020, pursuant to the Registration Statement, C3's Class A common stock began trading publicly on the New York Stock Exchange ("**NYSE**") under the trading symbol "AI." That same day, the Company filed a Prospectus with the SEC. Together, the

Prospectus and the Registration Statement are referred to herein as the "**Offering Documents**."

37.     As planned, pursuant to the Offering Documents, the Company issued 15.5 million shares of its Class A common stock at a price of $42.00 per share, reaping proceeds of approximately $610 million after applicable underwriting discounts and commissions.

38.     In connection with the IPO, insiders including the Individual Defendants entered into a 180-day lockup. The Registration Statement, however, carved out an exception to that standard 180-day lockup provision. Specifically, insiders could make initial stock sales after only *90 days* if certain conditions were met: (1) the transactions represented less than 20% of the insiders' overall shares; (2) C3 had issued a quarterly earnings release announced by press release through a major news service or on a report on Form 8-K; and (3) the last reported closing price of the Company's Class A common stock was at least 33% greater than the initial public offering price of the Class A common stock for 10 out of any 15 consecutive trading days, including the last day, ending on or after March 8, 2021, or the Early Release. Further, if March 8, 2021 occurred within five trading days of a trading black-out period, the above-referenced early expiration period would be the sixth trading day immediately preceding the commencement of the trading black-out period.

39.     In addition to describing this unusual lockup provision, the Offering Documents provided an overview of the Company, which stated, in relevant part:

**Extensive Partner Ecosystem**

We have established strategic relationships with technology leaders including AWS, Baker Hughes, Fidelity National Information Services, or FIS, Google, IBM, Microsoft, and Raytheon. These world-leading technology companies can marshal tens of thousands of talented resources to establish and serve small, medium, and large C3.ai customer relationships at global scale.

* * *

**Sales Alliances**

Strategic partnerships are core to our growth strategy with market-leading companies offering highly leveraged distribution channels to various markets.

To date, we have established such a partnership with Baker Hughes to address the needs of the global oil and gas market, with FIS to address needs in the financial services market, with Raytheon to serve the U.S. defense and intelligence communities, and with Microsoft and Adobe to address the next generation of CRM.

In addition, we have announced global alliances with AWS, IBM, Intel, and Microsoft to jointly market, sell, and service our combined solutions across industry verticals.

In the majority of our sales opportunities we are aligned with one or more of these partners.

40.     With regard to the Company's "Go-to-Market Strategy," the Offering Documents

stated:

Our go-to-market strategy is focused on large organizations recognized as leaders in their respective industries or public sectors, and who are attempting to solve complicated business problems by digitally transforming their operations. These large organizations, or lighthouse customers, include companies and public agencies within the oil and gas, power and utilities, aerospace and defense, industrial products, and financial services industries, among others. This has resulted in C3.ai powering some of the largest and most complex Enterprise AI applications worldwide. ***These lighthouse customers serve as proof points for other potential customers in their particular industries. Today, we have a customer base of a relatively small number of large organizations that generate high average total subscription contract value, but we expect that, over time, as more customers adopt our technology based on the proof points provided by these lighthouse customers, the revenue represented by these customers will decrease as a percentage of total revenue.*** As our AI Suite is industry agnostic, we also expect to expand into other industries as we grow. For example, for the fiscal year ended April 30, 2018, revenue from customers in the financial services, oil and gas, aerospace and defense, manufacturing, and utilities industries represented 0%, 1%, 3%, 29%, and 67% of our total revenue, respectively, and in the six months ended October 31, 2020, revenue from these customers represented 10%, 30%, 16%, 20%, and 25% of our total revenue, respectively.

* * *

The size and sophistication of our customers' businesses demonstrate the flexibility, speed, and scale of our products, and maximize the potential value to

our customers. To be a credible partner to our customers, who often are industry leaders, we deploy a motivated and highly educated team of C3 personnel and partners. *We go-to market primarily leveraging our direct sales force, and during the fiscal year ended April 30, 2020, we substantially increased the number of direct sales resources. We also complement and supplement our sales force with a number of go-to-market partners.*

- *Strategic Vertical Industry Partners.* We have developed an alliance program to partner with recognized leaders in their respective industries, such as Baker Hughes, Fidelity National Information Services, or FIS, and Raytheon, to develop, market, and sell solutions that are natively built on or tightly integrated with the C3 AI Suite.
- *Consulting and Service Partners.* As part of a global industry alliance, we partner with IBM Global Services, as well as a number of systems integrators specializing in Enterprise AI implementations.
- *Hyperscale Cloud and Infrastructure.* We have formed global strategic go-to market alliances with hyperscale cloud providers including Amazon, FIS, Google, and Microsoft. In addition, we have strategic alliances with leading hardware infrastructure providers to deliver our software optimized for their technology.

These partners include Hewlett Packard Enterprise, and Intel. These partners supply infrastructure solutions, data management and processing services, or hardware and networking devices (e.g. IoT gateways) to support C3.ai product implementations and complement C3.ai's products.

* * *

*In addition to the activities of our field sales organization, our success in attracting new customers will depend on our ability to expand our ecosystem of strategic partners and the number of industry verticals that they serve. Our strategic go-to-market alliances vastly extend our reach globally. Some of our most notable partners include Baker Hughes, FIS, IBM, and Microsoft. Each strategic partner is a leader in its industry, with a substantial installed customer base and extensive marketing, sales, and services resources that we can leverage to engage and serve customers anywhere in the world.* Using our AI Suite as the development suite, we leverage our model-driven architecture to efficiently build new cross-industry and industry-specific applications based on identifying requirements across our customer base of industry leaders and through our industry partners. Our strategy with strategic partners is to establish a significant use case and prove the value of our AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry partner in oil and gas, Baker Hughes, as well as with our iconic global customers, some of whom are deploying C3.ai technology to optimize thousands of critical assets globally across their upstream, midstream, and downstream operations. We establish formal sales and marketing plans with each partner, including specific sales goals and dedicated budgets, and we work closely with these partners to

identify specific target accounts. We intend to grow the business we do with each partner and to add more partners as we expand the vertical markets we serve. We also offer revenue generating trials of our applications as part of our customer acquisition strategy.

In June 2019, we entered into a three-year arrangement with Baker Hughes as both a leading customer and as a partner in the oil and gas industry. This arrangement included a subscription to our AI Suite for their own operations (which we refer to below as direct subscription fees), the exclusive right for Baker Hughes to resell our offerings worldwide in the oil and gas industry, and the non-exclusive right to resell our offerings in other industries. Under the arrangement, Baker Hughes made minimum, non-cancelable, total revenue commitments to us of $50.0 million, $100.0 million, and $170.0 million, which are inclusive of their direct subscription fees of $39.5 million per year, for each of the fiscal years ending April 30, 2020, 2021, and 2022, respectively, with the remainder to be generated from the resale of our solutions by the Baker Hughes sales organization.

During the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement. This arrangement was revised in June 2020 to extend the term by an additional two years, for a total of five years, with an expiration date in the fiscal year ending April 30, 2024 and to modify the annual amount of Baker Hughes' commitments to $53.3 million $75.0 million, $125.0 million, and $150.0 million, which are inclusive of their revised direct subscription fees of $27.2 million per year over the fiscal years ending April 30, 2021, 2022, 2023, and 2024, respectively. Any shortfalls against the total annual revenue commitment made to us by Baker Hughes will be assessed and recorded by us at the end of the fourth quarter of each fiscal year. We are obligated to pay Baker Hughes a sales commission on subscriptions to our products and services offerings it resells in excess of these minimum revenue commitments.

Our RPO related to Baker Hughes, which includes both direct subscriptions and reseller arrangements, is comprised of $19.9 million related to deferred revenue and $20.0 million from non-cancellable contracts as of April 30, 2019, $2.4 million related to deferred revenue and $84.8 million from non-cancellable contracts as of April 30, 2020, and $16.9 million related to deferred revenue and $91.9 million of commitments from noncancellable contracts as of October 31, 2020.

As of July 31, 2019, October 31, 2019, January 31, 2020, April 30, 2020, July 31, 2020, and October 31, 2020 the total remaining amount of Baker Hughes minimum revenue commitments not yet contracted under the direct subscription fee or reseller arrangement, and thus subject to the shortfall annual provisions, under the entire arrangement was $194.0 million, $195.0 million, $190.3 million, $183.8 million, $270.9 million, and $249.9 million, respectively.[1]

---

[1] All emphasis in quotations is added unless otherwise noted.

41.     When describing the Company's TAM, the Offering Documents stated:

**Large Total Addressable Market**

We serve a large and rapidly growing market, ***estimated to be $174 billion in 2020, growing to $271 billion in 2024***, based on IDC and Gartner reports.

Our total addressable market, or TAM, comprises multiple enterprise software segments that are growing at a combined compound annual growth rate, or CAGR, of 12%:

- *Enterprise AI Software.* According to IDC, the relatively new but rapidly growing global Enterprise AI software market totaled $18 billion in 2020, and will grow to $44 billion in 2024—a 24% CAGR. We address this market with our AI Suite and full portfolio of AI Applications.
- *Enterprise Infrastructure Software.* The C3 AI Suite replaces a wide range of existing enterprise infrastructure software categories, including Application Development, Application Infrastructure and Middleware, Data Integration Tools and Data Quality Tools, and Master Data Management Products. According to Gartner, the size of the infrastructure software market across these four segments totaled $63 billion in 2020, and will grow to $82 billion in 2024—a 7% CAGR.
- *Enterprise Applications.* C3 AI Applications address a wide range of Analytics and Business Intelligence use cases as well as the Customer Experience and Relationship Management (CRM) segment. According to Gartner, the size of the software market across these segments totaled $93 billion in 2020, and will grow to $145 billion in 2024—a 12% CAGR. C3.ai is an active participant in the Enterprise AI/ML, Data Analytics, Cloud Computing, and Digital Transformation markets. According to IDC, by 2022, 65% of CIOs will digitally empower and enable front-line workers with data, AI, and security and by 2025, 80% of CIOs alongside lines-of-business will implement intelligent capabilities to sense, learn, and predict changing customer behaviors.

42.     Touting the Company's "extensive partner ecosystem," the Offering Documents

stated:

We hav established strategic relationships with technology leaders including Amazon Web Services, or AWS, Baker Hughes, Fidelity National Information Services, or FIS, Google, IBM, Microsoft, and Raytheon. These world-leading technology companies can marshal tens of thousands of talented resources to establish and serve small, medium, and large C3.ai customer relationships at global scale.

We form go-to-market and product co-development alliances with our partners that combine our AI expertise and technology with our partners' deep domain expertise

to bring next-generation C3.ai solutions to joint customers. Our partnerships include strategic alliance across four categories:

- *Industry Partners.* Each industry partnership focuses on a key vertical. We have formed global strategic alliances in the energy industry with France-based global energy leader ENGIE (also a customer); in oil and gas with Baker Hughes, a global leader in oilfield services (also a customer); and in financial services with FIS, leading technology provider to the global financial services industry; and in the U.S. Federal and aerospace sectors with Raytheon, one of the world's largest aerospace and defense manufacturers.

- *Hyperscale Cloud and Infrastructure Partners.* We have formed global strategic go-to-market alliances with hyperscale cloud providers including Amazon, Microsoft, and Google. In addition, we have strategic alliances with leading hardware infrastructure providers to deliver our software optimized for their technology. These partners include Hewlett Packard Enterprise and Intel.

- *Consulting and Services.* We have formed a global strategic go-to-market alliance with IBM Global Business Services, who employs more than 100,000 service professionals. We have also established partnerships with select specialized systems integrators that provide application design and development, data engineering, data science, and systems integration services, including Aubay, BGP, CMC, Data Reply, Infoedge Technology, Informatica El Corte Ingles, Intelia, Neal Analytics, Ortec, Pariveda, SCAP, and Synechron. These alliances are focused on helping organizations accelerate their Enterprise AI and digital transformation programs.

- *Independent Software Vendors.* Our ISV partners develop, market, and sell application solutions that are natively built on or tightly integrated with the C3 AI Suite. The C3 AI Suite enables ISVs to deliver AI capabilities to their installed user base that enhance or complement existing ISV application functionality. As of September 20, ISV partners include ENGIE, FIS, and Ortec.

43. Following the Company's IPO, the Individual Defendants caused the Company to make similar misstatements and omit material facts concerning, *inter alia*, the size of the Company's sales force, the state of C3's strategic partnerships (particularly with Baker Hughes), and the value of the Company's go-to-market strategy, all while working to enrich themselves at the Company's expense.

44. ████████████████████████████████████████

████████████████████████████████████████



45. ████████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████

46.     Despite these challenges, known to certain insiders but not to the investing public,

the next day at a KeyBanc Emerging Technology Summit, Defendant Siebel touted the Company's

"vertical markets sales organizations," stating, in relevant part:

> So the distribution model looks like geographically we're applying major account groups, enterprise groups, middle market groups and mass market groups. This is what we are doing with this capital that we raised to the markets. And then *we are building vertical markets sales organizations for financial services, manufacturing, aerospace, health, telco, utilities and oil and gas.* You see that we have made a number in each of these we're aligned with –we're aligning with a market partner, for example, in oil and gas we go to market with Baker Hughes. *Baker Hughes has 12,000 people selling for us around the world into virtually every oil and gas company on the planet in for a safe energy,* clean energy, sustainability we go to market with ENGIE on Paris.

> In financial services, we've formed an alliance with FIS, that is both selling our products and replatforming their products on our – using the C3 AI suite in telco – excuse me, in defense, and intel – intelligence communities we go to market with Raytheon. We'll be announcing – in the next few weeks a new relationship in

---

[2] Citations to "C3_220_Vo_########" refer to documents produced by the Company in response to Plaintiff's Section 220 demand.

manufacturing. And then you can expect we will be forming a large relationship with health and telecommunications. We have a very significant partnership with Microsoft, and AWS, and we go to market with Google and IBM and Intel, Nvidia is a large partner.

And so how does this work? So, this for example, if we're calling on Bank of America this will be my group in New York working with my financial services group, working FIS, partnering with IBM to make Bank of America successful. This would be Royal Dutch Shell, well (00:20:51) out of Amsterdam working with my sales and marketing group working with Baker Hughes, working with Microsoft to make them successful. So, that's the model. ***And so, we're working towards – couple of years ago we had 16 sales teams and these – our sales teams are growing, we have 12,000 people at Baker Hughes***, tens of thousands of people at Microsoft. Thousands of people at FIS, more to follow, but we can see that the vision is across all geographies and all indices through these partnerships to have tens to hundreds of thousands of people standardizing on this technology stack and serving customers.

47.     Also, during the KeyBanc Emerging Technology Summit, Siebel responded to a question about the value of Company's partnerships with Baker Hughes and companies in other verticals as follows:

They're useful, they're invaluable, and they're core to the strategy. Let's think about Baker Hughes. So, Baker Hughes is one of the three large oil and gas service providers, the other two being of course Halliburton and Schlumberger. Okay. We have partnered exclusively with Baker Hughes where they've agreed they're going to build all of their software solutions on the C3 AI Suite. This replaces with the previous stack that they brought over from GE. Okay. ***So, Baker Hughes – this partnership – in partnership with Baker Hughes, we have 12,000 people selling every day into the oil and gas industry. Come on, for a company like us to get 12,000 people.***

48.     On March 1, 2021, the Company issued a press release reporting the Company's results for the third quarter of the 2021 fiscal year. The press release stated, in relevant part:

We continue to establish our leadership as the only enterprise AI software pure play," said CEO Thomas M. Siebel. "This is a large and rapidly growing market; we continue to innovate; we continue to expand our market-partner ecosystem and associated distribution capacity; and we continue to demonstrate technology leadership. I believe that we are increasingly well-positioned to establish a global market leadership position in enterprise AI software.

* * *

- C3 AI significantly expanded its market-partner ecosystem to broaden its distribution and service network globally. In addition to expanding its market partnership activities with Microsoft, Baker Hughes, and ENGIE, C3 AI extended our relationship with Raytheon to serve the defense and intelligence communities; with FIS, a global financial services software company, to serve the banking and financial services industries; and with Infor to serve the global ERP market.

49.     Also on March 1, 2021, the Company hosted an earnings call to discuss C3's Q3

2021 financial results (the "**Q3 2021 Earnings Call**"). During the scripted portion of the Q3 2021

Earnings Call, Defendant Siebel stated:

> We continue to expand our market partner ecosystem and the associated increased distribution capacity associated with that. We continue to demonstrate technology leadership. I believe that we are increasingly well positioned to establish a global market leadership position in enterprise AI software. So let's talk about the financial highlights. All in all, it was a strong third quarter. Revenue in the third quarter was $49.1 million. $42.7 million of that was subscription revenue, an increase of 23% from a year earlier.

50.     Moreover, during the Q3 2021 Earnings Call, the following exchange occurred

between Defendant Siebel and an analyst:

> **Brad Sills, Analyst**
>
> Oh, great. Hey, thanks guys for taking my question and congratulations on your first quarter as a public company. I wanted to ask about the vertical partner focus here. Obviously, you talked about some leverage that you'll see here from some of these partnerships could you help us understand for perhaps some of the newer ones like Raytheon FIS, these are relatively new verticals for the company. What kind of resources are committed from these partners? How are you going to market together? How are you expected to get that leverage through these partnerships? Thank you so much.
>
> **Thomas M. Siebel, Chairman and Chief Executive Officer**
>
> Hey, Brad. I'll fill this one because it's kind of sales to marketing related. Well, as you know, we're going to market across three plains. We have horizontal market partners like say Microsoft would be the largest, but also IBM NVIDIA. We're building a geographic marketing organization in North America, Asia Pacific, okay, and in Europe. And then across all sectors, we have vertical market sales organizations in oil and gas, in utilities, in financial services, in precision health, et cetera. And you can get expect that each of the – the goal is that each of these vertical markets we will align with a leveraged market partner. So the classic case

is Baker Hughes. *So we've aligned in oil and gas with Baker Hughes, this is a 24 roughly, I think, billion-dollar oil services company that gives us access to 12,000 people now selling with us around the world. And there's virtually not one of the largest, say 20 or 30 oil companies, that we're not in active sales motion with, whether it's Aramco, ADNOC, Rosneft Gazprom, Shell, and 12,000 salespeople is a lot of sales capacity.*

51.     On March 2, 2021, at a Morgan Stanley Virtual Conference, Defendant Abbo responded to a question regarding how the Company selected Baker Hughes as its partner in the oil and gas industry as follows:

> Well, first of all, the software we're talking about really is – requires the main knowledge and domain expertise and obviously, Baker Hughes has extensive domain knowledge in this industry as a leader in oil field services. So it was not it was not difficult to make that selection or Conner, we're not talking about general purpose software like SAP and ERP enterprise resource planning software. We're really talking about software that is deep domain experience and expertise and the AI in ML models are basically capturing the inherent processes and the know-how of the industry to basically improve the operations of that particular industry. *And so there is no better partner than Baker Hughes. They basically have a long-standing deep relationships with almost all oil and gas companies, independent national companies out there. The collaboration is I would say is very deep if you will. So we're collaborating on product. We're collaborating on the customer engagement to make them successful and Uwem [Ukpong] and I speak on a multiple times on a weekly basis. So it's really a very deep partnership between the two companies. Our objective is to drive digital transformation for large – medium and large oil and gas companies. So that's why we chose Baker Hughes.*

52.     That same day, at a JMP Securities conference, Defendant Siebel represented that "now with Baker Hughes, we have 12,000 salespeople selling for us around the world and into every oil and gas company on the planet, Aramco, ADNOC, Gazprom, Rosneft, Exxon, you name it."

53.     At the same conference, responding to a question about the Company's go-to-market strategy and the way that C3 planned to grow its number of customers, Defendant Siebel responded:

**Patrick Walravens, Analyst**

All right, good. So this leads us really nicely to the question someone in the

audience, just asked, which is and I'll just read it to you, which is, could you talk a bit about your go-to-market strategy and how you would grow your number of customers?

**Thomas M. Seibel, Founder and Chief Executive Officer**

Yes, we have a pretty complex go-to-market strategy. So we have horizon, we have geographical organizations, APAC EMEA. Okay and the North American Group, within which we are building a major accounts group, a enterprise sales group, a middle market group and a mass market group. Then we're building vertical market sales organizations for oil and gas, for utilities for tele-communications, for healthcare, for aerospace and for defense.

Okay. And within each of those, we're building a major accounts group, a strategic accounts group, a middle market group and a mass market group. ***Then associated with each of the verticals we're aligning with a market partner, which gives us market leverage, for example at oil and gas, we go to market with Baker Hughes. That gives us 12,000 people selling for us and allows us to walk immediately into the board room of Aramco. It would take us 10 years to get to the more – [board] room of Aramco, okay, but for Baker Hughes.***

54.　　Defendant Siebel also made the following statement at the JMP Securities conference:

I think that Microsoft – I mean, these guys at Microsoft – Now, let's talk a little bit about what's going on with Microsoft today? We are in sales motion, an enterprise sales motion aligned with the Azure people, and SAT, and JP, and (inaudible) and probably 200 accounts around the world, in major account selling were, four legged sales calls and if it's oil and gas, it's a six legged sales call. For example at, Shell, okay, we'll have Baker Hughes, we'll have C3 and we will have Microsoft and we'll bring all of our services. And Shell way quite honestly doesn't know where Microsoft lets off and C3 starts and Baker Hughes picks up, and they don't care. They just know that they have all the services that they need. ***So that we have a similar relationship with them in CRM. I would say the second most mature partnership that we have Baker Hughes, I think we're seven quarters into that and now we have 12,000 people selling for us at Baker Hughes.***

55.　　On March 8, 2021—the very first day that the "early bird" 90-day lockup period expired—Defendants Siebel and Abbo sold $214 million dollars' worth of shares of C3 common stock in a single day.

56.　　On May 24, 2021, at the JP Morgan Global Tech Conference, Defendant Siebel again noted that, in connection with the Company's partnership with Baker Hughes, C3 had

*"12,000 people selling C3 for us all around the world every day, 12,000 people."*

57. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

58. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

59. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

60. ███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

61. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

{01898952;v1 }

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■

62. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■

63.     On June 25, 2021, Defendants filed an annual report on Form 10-K with the SEC

(the "**2021 10-K**"). The 2021 10-K stated, in relevant part:

Strategic partnerships are core to our growth strategy with market-leading companies offering highly leveraged distribution channels to various markets. Examples of these partnerships are listed below:

- *Baker Hughes: Oil, Gas, and Chemicals.* In 2019, we a formed a strategic alliance with Baker Hughes, a $24 billion oil and gas services company. Under the terms of this alliance, Baker Hughes has standardized on C3 AI for all internal use AI applications. ***In addition, we are jointly marketing and selling a range of Enterprise AI solutions to address the entire value of upstream, mid-stream, and downstream activity under the BHC3 brand to oil and gas companies globally with the active engagement of Baker Hughes, which has a 12,000-person sales organization.***

64.     On August 12, 2021, at the Canaccord Genuity 41st Annual Growth Conference,

Defendant  Siebel stated:

We're forming major account groups, enterprise sales groups, middle market groups and then mass market groups in each vertical market where we've been building out very significant market partners, who distribute these products with us for example in oil and gas at Baker Hughes. ***And Baker Hughes has 12,000 people selling with us around the world in oil and gas market, and since then we've penetrated Baker Hughes,*** Shell, Coke, MEG, LyondellBasell, Georgia – Flint Hills Research.

65. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

██████████████████████████████████████

66.  ████████████████████████████████████

████████████████████████████████████████

████████████████████████████

67.  ████████████████████████████████████

████████████████████████████████████████

████████████████████████

68.     On September 1, 2021, Defendants filed a quarterly report on Form 10-Q with the SEC reporting on the first quarter of the Company's 2022 fiscal year (the "**1Q 2022 10-Q**"). Despite the challenges identified during Board and Audit Committee meetings just days earlier, the 1Q 2022 10-Q continued to tout the activities of the Company's "field sales organization" as well as C3's "strategic go-to-market alliances," including its "notable" partnership with Baker Hughes:

> *In addition to the activities of our field sales organization*, our success in attracting new customers will depend on our ability to expand our ecosystem of strategic partners and the number of industry verticals that they serve. *Our strategic go-to-market alliances vastly extend our reach globally. Some of our most notable partners include Baker Hughes…* Each strategic partner is a leader in its industry, with a substantial installed customer base and extensive marketing, sales, and services resources that we can leverage to engage and serve customers anywhere in the world. Using our C3 AI Suite as the development suite, we leverage our model-driven architecture to efficiently build new cross-industry and industry-specific applications based on identifying requirements across our customer base of industry leaders and through our industry partners. Our strategy with strategic partners is to establish a significant use case and prove the value of our C3 AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry partner in oil and gas, Baker Hughes, as well as with our iconic global customers, some of whom are deploying C3 AI technology to optimize thousands of critical assets globally across their upstream, midstream, and downstream operations. We establish formal sales and marketing plans with each partner, including specific sales goals and dedicated budgets, and we work closely

with these partners to identify specific target accounts.

69.     On September 10, 2021, at the Deutsche Bank Tech Conference, Defendant Siebel

had the following exchange with an interviewer:

**Patrick Colville**

Okay. Yes. And I guess, I mean, a key partner both historically and going forward, it's been Baker Hughes. C3 has got an amazingly close partnership with them and my conscience is they can use C3 software both internally in their environment and resells the software. Can you just help us understand that partnership and just kind of help us understand how's it kind of doing in a moment?

**Thomas M. Siebel, Chairman and Chief Executive Officer**

Yes. Baker Hughes, we entered into a strategic partnership with them some years ago. They do use the application for some internal applications, like inventory optimization and what have you, and we go to market with them globally. ***So we have go-to-market motion with them at virtually every major order of 12,000 people working with us in all divisions of Baker Hughes and we have sales marketing activities going on in virtually every oil and gas company in the world and they're in various stages of early stages, running pilots, in some cases, running production applications in places like Shell,*** LyondellBasell, and Koch, but that's a strategic partnership and it's extraordinary positive.

70.     On September 13, 2021, at the Piper Sandler 2021 Global Tech Conference,

Defendant Siebel had the following exchange with an analyst:

**Arvind Ramnani, Analyst**

Terrific, terrific. And I think your go-to-market approach is also very unique, right. I mean, it's -- kind of building AI company is difficult, but also some of the approach you've taken is I think quite different. Looking to have really leveraged partners such as Baker Hughes, FIS in specific verticals, what is the rationale for partnering with these vertical leaders versus sort of really going after the market by yourself?

**Thomas M. Siebel, Chairman and Chief Executive Officer**

Well, it gives us market leverage, I mean, we're 700 people. ***I have 12,000 people selling for me at Baker Hughes into oil and gas.*** At FIS, I have thousands of people selling with me into the financial services and banking market. I saw with Microsoft across a wide range of markets.

71.     Unbeknownst to the market, on October 31, 2021, C3 and Baker Hughes restructured their joint venture agreement to address the fact that Baker Hughes had relegated sales of C3 products to a separate sales division that relied on salespeople that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' regular 12,000-person salesforce. Accordingly, despite the Individual Defendants' representations to the contrary, it was not until *after* October 31, 2021 that Baker Hughes made its sales team of 12,000 people available to market C3 products.

72.     ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

73.     On November 29, 2021, at a KeyBanc Summit, Defendant Siebel had the following exchange with an interviewer:

**Michael Turtis**

So speak of these verticals, I want to switch over to your go-to-market strategy, which is quite powerful and unique in terms of the way that you've entered some of these verticals by partnering with some of the other participants in those vertical industries. So, I talked about Baker Hughes, about Raytheon, FIS, what would you want for the strategy in general? And then I'd like at some point maybe to finish on Microsoft because you've got a formal unannounced partnership there. But let's talk through some of these others as well.

**Thomas M. Siebel, Chairman and Chief Executive Officer**

Our market, we have a relatively complex go-to-market strategy where we are organized both geographically, vertically and by market partner. So I have geographic coverage for North America, for EMEA and for APAC. Within each of

those, I have enterprise sales groups, middle market sales groups and then marketplace sales group, selling the mass audiences. Orthogonal to that we have the vertical market sales organization that we're developing product and fielding sales and service organizations for the oil and gas industry, for the utility industry, for the telecommunications industry, for the financial services industry, what have you. In each of those verticals I am forming partnerships with a highly leveraged market partner. For example, in oil gas, I go to market with Baker Hughes. ***Baker Hughes is of course one of the largest oil and gas service providers and they have 12,000 people selling with us around the world every day to name the company, be it Rosneft Gazprom, Chevron, whoever it may be.***

74.     Also at the KeyBanc Summit, in response to a question regarding the size and the evolution of the Company's partnership with Baker Hughes, Defendant Siebel stated as follows:

Well, let's look at the history of Baker Hughes. Baker Hughes, of course, was acquired by GE Oil & Gas. And so the leadership of GE Oil & Gas went over to run Baker Hughes and they took the Predix with them. So, Predix was their digital platform to reach the oil and gas industry. And after some time, they made this decision to switch from Predix to C3 AI for reasons that I'll let you ask them sometime. And the nature of the relationship that we entered into with Baker Hughes, it was a strategic partnership where they took an equity position in C3 that was pretty significant. ***We agreed that we would go to market with no other oil and gas service provider that Baker Hughes would be our sole provider and that they would be marketing our solutions through their 12,000-person sales organization globally.***

### THE TRUTH BEGINS TO EMERGE

75.     Finally, on December 1, 2021, after the market closed, the Company issued a press release announcing its financial results for the second quarter of its 2022 fiscal year (the "**Q2 2022 Press Release**"). The Q2 2022 Press Release revealed that the Company's non-GAAP adjusted RPO showed *zero growth* year-over-year, even when accounting for an incremental $45 million increase in the value of the Baker Hughes contract following the restructuring of the Company's joint venture with Baker Hughes.

76.     That same day, the Company held an earnings call during which Defendant Siebel revealed for the first time that the Company had undertaken a massive restructuring of its salesforce in July, only to restructure again in the last month of the quarter. Defendant Siebel

stated, in relevant part:

> Now historically C3 AI has relied upon a high-touch, white glove service strategic selling model to acquire and obtain customers. In July of 2021, in an attempt to further accelerate revenue scalability and customer adoption, we reorganized sales as an independent unit along traditional hierarchically regimented selling structures like those in place at SAP and IBM. That proved to be a mistake.

> While the revenue came in the quarter was strong, the overall performance of the sales organization and specifically new sales activity in the second quarter was unacceptable. The management team and I have spent the past month restructuring the global sales function, molded in the traditional model that we know to be effective, as a high-touch, classic, strategic selling machine. That process is now complete and the early indicators are quite positive. Our customer has increased. Our sales visibility has increased and the amount of revenue of Q3 revenue that we have closed as of the end of November, gives us very high confidence levels in our Q3 revenue forecast.

77.     Moreover, Defendant Siebel disclosed for the first time that the Company had not, in fact, had full access to Baker Hughes' 12,000-person salesforce and that, instead, Baker Hughes had set up a separate sales division that risked Baker Hughes not performing effectively under the companies' partnership. Defendant Siebel stated, in relevant part:

> ***The real motivation behind restructuring Baker Hughes was to basically kind of realign the sales structure.*** So Baker Hughes is, I think roughly $28 billion business and they run four central business units and, you know the real relationship with Baker Hughes has to the deep, deep industry expertise in oil and gas, process industries and kind of manifest -- chemicals, petrochemical business and they are kind of the masters in the universe of that and they have these unbelievably close relationships going back, now I think 70 years with everybody in the world from Rosneft to Gazprom to Aramco to Shell, Chevron, you name it, okay.

> And those relationship and that expertise are in their four business units. ***When we first put together the relationship with Baker -- with C3 AI-Baker Hughes, they basically formed a new business unit that was called Baker Hughes C3[]. That sat outside of those organization. And so they really weren't the people with the relationships and they weren't the people with the quotas and they weren't the people with the deep industry expertise and what really did here was as we restructured it in a way, that we put all the sale resources end of the quota in operating units of Baker Hughes. Okay?***

78.     The following day, C3's stock plummeted to close at $30.04 per share—the lowest price that year and well off the high of $177.47 per share on December 22, 2020—just days after

the IPO.

79.     Despite making this partial disclosure, the Individual Defendants continued to make material misrepresentations after disclosing the truth about the Company's sales resources.

80.     Indeed, during the Company's December 1, 2021 earnings call, C3 touted to investors that the third amendment to the Baker Hughes joint was positive as it increased total revenue commitments to the Company.

81.     For example, at the Annual Virtual Wells Fargo TMT Summit on December 2, 2021, Defendant Siebel stated: "If we look at the analysts' predictions for the size of the enterprise AI software market, ***this promises to be on the order of a $300 billion software market*** in, say, 2025."

## THE TRUTH FULLY EMERGES

82.     On February 16, 2022, Spruce Point issued its report including a strong sell research opinion regarding the Company.

83.     The Spruce Point Report noted that the Company's partnership with Baker Hughes—which had been restructured three times since the original joint venture agreement was signed in 2019—was supporting the Company's sales through minimum guarantees. Indeed, Baker Hughes is the Company's largest customer, representing approximately 30% of C3's sales in the 2021 fiscal year.

84.     According to the Spruce Point Report, however, a former C3 employee described the Company's partnership with Baker Hughes as "a marriage that is not working." Indeed, when the joint venture agreement between C3 and Baker Hughes was amended for the third time on October 31, 2021, the remaining minimum revenue commitment for the 2022 fiscal year was eliminated and Baker Hughes' peak revenue commitment was reduced and delayed until the 2025

fiscal year. The third amendment also included other onerous provisions to C3, including price discounts to prospective customers.

85.    Given that the contract amendments continued to push revenue into the future, the Spruce Point Report questioned whether the partnership between Baker Hughes and C3 would survive past the end of the contract term.

86.    Perhaps most shocking was the revelation reported by Spruce Point that C3 was paying Baker Hughes $25 million in sales commissions on what Spruce Point determined to be a maximum of $11 million of eligible revenues for commission payments. C3 agreed to pay these commissions even though the Baker Hughes joint venture was not on track to surpass its minimum revenue requirement for the 2022 fiscal year.

87.    Moreover, as disclosed by Spruce Point, despite the Company's statements to the contrary during the December 1, 2021 earnings call, the third amendment to the partnership between C3 and Baker Hughes would reduce the net cash commitments to the Company from the joint venture.

88.    The Spruce Point Report suggested that other highly-promoted partnerships with companies like Google, Microsoft, AWS, and Intel either were not as significant as the Company claimed or had not grown to the degree that the Company had promised. For example, sales agents at Hewlett Packard and Microsoft barely even recognized C3's name and made no efforts to sell Spruce Point employees any C3 products or services. Similarly, despite the Company's claims about its "strategic alliance with Google Cloud," Spruce Point noted that C3 is not even referenced as a "Featured Partner Solution" on Google Cloud's AI and machine learning website.

89.    Spruce Point also highlighted that, during the IPO process, the Company materially changed its TAM from $170 billion to $271 billion. In the Offering Documents, the Company

claimed that C3's market would grow to $271 billion by 2024. In the Company's September 2020 prospectus, however, only two months before the IPO, C3 claimed that it served "a large and rapidly growing market, estimated to be $106 billion in 2020, growing to $170 billion in 2024."

90.     Finally, the Spruce Point highlighted the high levels of attrition at the Company, from the sales teams to the CFO. The Spruce Point Report noted that there had been three different CFOs at the Company since the beginning of its IPO process in September 2020, pointing out that Defendant Barter resigned after only 14 months at the Company and forfeited over 900,000 unvested options with an intrinsic value of approximately $20 million.

91.     With regard to sales and business development, a former C3 employee noted that he or she had four bosses in six months, noting that "attrition is a real problem."

92.     Following publication of the Spruce Point Report, the Company's stock price dropped $1.01 per share (3.9%) to close at $24.70 per share on February 16, 2022.

## THE FALSE AND MISLEADING PROXY STATEMENT

93.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue a false and misleading proxy statement on August 20, 2021 (the "Proxy").[3]

94.     The Proxy recommended, among other things, that shareholders elect Individual Defendants Siebel, House, and Sastry as directors for three-year terms. The Proxy assured stockholders that the Company had designed and implemented processes to manage risk in its operations and that the Board, together with its committees, was responsible for ensuring that the

---

[3] These proxy allegations are based solely on negligence. They are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

risk management processes designed and implemented by management were appropriate and functioning as designed.

95. The Proxy also noted that the Audit Committee assists the Board "in fulfilling its oversight responsibilities with respect to risk management in our major financial risk exposures and the areas of internal control over financial reporting and disclosure controls and procedures."

96. Despite these assurances that the Individual Defendants actively monitored the Company's risks and exposures, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls, which resulted in the issuance of the false and misleading statements described herein.

97. As a result of the materially false and misleading statements in the Proxy, the Company's stockholders voted via uninformed stockholder votes to reelect the Individual Defendants proposed for reelection in the Proxy.

## FIDUCIARY DUTIES

98. By reason of their positions as officers and directors of the Company, throughout their tenure at the Company, each of the Individual Defendants owed C3 and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to his or her utmost ability to control and mange C3 in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of C3 and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

99. Each Individual Defendant, during their tenure at the Company, owed  C3 and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

100. The Individual Defendants, because of their positions of control and authority as

directors and/or officers of C3, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with C3, each of the Individual Defendants had knowledge of MNPI regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

101.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements— including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b) conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c) remain informed as to how C3 conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d) truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

***Duties Pursuant to the Company's Code of Business Conduct and Ethics***

102.    The Individual Defendants, as officers and/or directors of C3, were bound by the Company's Code of Business Conduct and Ethics (the "**Code of Ethics**"), which required, *inter*

*alia*, the following:

> Conduct that is dishonest, illegal or unsafe is not tolerated at C3 AI. Any employee who violates the standards in this [Code of Ethics] may be subject to disciplinary action, that, depending on the nature of the violation and the history of the employee, may range from a warning or reprimand to termination of employment and, in appropriate cases, civil legal action or referral for criminal prosecution.

\* \* \*

## 1. HONEST AND ETHICAL CONDUCT

It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. C3 AI's integrity and reputation depend on the fairness and integrity brought to the job by each person associated with us. Personal integrity and sound judgment are the foundation of C3 AI's corporate integrity.

## 2. LEGAL COMPLIANCE

Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their business units and areas of responsibility and to be familiar with and comply with other C3 AI policies relating to legal compliance, including C3 AI's Anti-Corruption Policy and Insider Trading Policy. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as C3 AI, to civil and/or criminal penalties, and may be grounds for disciplinary action, upto and including termination of employment.

## 3. INSIDER TRADING

Employees, officers and directors who have access to material, non-public (or "inside") information are not permitted to use or share that information for stock trading purposes. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal. Please refer to C3 AI's Insider Trading Policy for more detailed information.

\* \* \*

## 6. CONFLICTS OF INTEREST

C3 AI expects its employees, officers and directors to be free from influences that conflict with the best interests of C3 AI or might deprive C3 AI of their undivided loyalty in business dealings. Making judgments, taking decisions, or pursuing actions when facing a conflict of interest may make it difficult to perform duties objectively and effectively and may have legal or regulatory consequences. Employees, officers and directors should avoid situations where their personal

interests (financial or otherwise) may conflict with or compromise C3 AI's interest, could potentially result in a conflict of interest or could otherwise have the appearance of impropriety…

103.     At its core, the Code of Ethics expressed the Company's purported commitment to conducting its affairs honestly and ethically, and laid out the expectation that all C3 employees, officers, and directors would "act with integrity, apply good judgment and observe the highest personal ethical standards in making business decisions." The Individual Defendants failed to satisfy their obligations under the Code of Ethics by, *inter alia*, failing to comply with relevant legal and regulatory requirements and, as to the Insiders, by engaging in insider trading.

***Duties Pursuant to the Company's Audit Committee Charter***

104.     In addition to these duties, the Director Defendants who served on the Audit Committee during the Relevant Period—Defendants Davis, Levin, and McCaffery (the "**Audit Committee Defendants**")—owed specific duties to C3 under the Audit Committee Charter.

105.     According to the Audit Committee Charter, the purpose of the Company's Audit Committee is to, among other things, "oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;" "review any reports or disclosures required by applicable law and stock exchange listing requirements;" and "help the Board oversee the Company's legal and regulatory compliance, including risk assessment[.]"

106.     Specifically, the Audit Committee Charter set forth the following responsibilities of the Audit Committee Defendants:

> The Committee's responsibilities are for oversight, as described under "Purpose" above. The members of the Committee are not employees of the Company, and they do not perform management's or any Auditors' functions. The Committee relies on the expertise and knowledge of management, the internal auditors (if any), and any Auditors in carrying out its oversight responsibilities. Management is responsible for preparing accurate and complete financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"), crafting periodic

reports, and establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The Auditors will audit the Company's annual consolidated financial statements and, when required, the effectiveness of the Company's internal control over financial reporting and review the Company's quarterly financial statements. It is not the Committee's responsibility to prepare or certify the Company's financial statements, guarantee the audits or reports of the Auditors, certify as to whether any Auditors are "independent" under applicable law or stock exchange listing requirements, or ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP, or otherwise comply with applicable law or stock exchange listing requirements or the Company's policies. Following the Public Effective Date, the Committee shall have the following responsibilities, some of which it may assume prior to such date in its discretion; provided, however, that this list of responsibilities is intended to be a guide and to remain flexible to account for changing circumstances and needs. Accordingly, the Committee may depart from or supplement such responsibilities, and establish policies and procedures, to the extent permitted by applicable law and stock exchange listing requirements.

* * *

*Internal Control and Procedures:*

**10.     Risk Assessment and Management.** The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition, and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee shall review and approve as appropriate the Company's decision to enter into swaps or other derivative transactions that are exempt from exchange-execution and clearance under "end-user exception" regulations established by the Commodity Futures Trading Commission, and to review and discuss with management the Company's Foreign Exchange Policy, including the Company's use of swaps.

**11.     Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and, to the

extent necessary, any remediation plans or special audit steps adopted in light of any material control deficiencies.

* * *

**13.     Internal Control Report.** At least annually (if required by applicable stock exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

* * *

**15.     Ethical Compliance.** The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and stock exchange listing requirements, including the Company's Code of Business Conduct and Ethics (the "Code").

* * *

***Other Matters:***

* * *

**18.     Other Legal and Finance Matters.** The Committee will review with management legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee.

### ***Duties Pursuant to the Company's Nominating and Corporate Governance Committee Charter***

107.     The Director Defendants who served on the Nominating and Corporate Governance Committee during the Relevant Period—Defendants McCaffery, Sewell, and Ward (the "**Nominating Committee Defendants**")—also owed specific duties to C3 under the Nominating and Corporate Governance Committee Charter (the "**Nominating Charter**").

108.     Specifically, the Nominating Charter described the "oversight responsibilities" of the Nominating Committee Defendants as requiring them to, *inter alia*, "help the Board oversee the Company's corporate governance functions and develop, update as necessary and recommend

to the Board the governance principles applicable to the Company" and "periodically review and assess the Company's corporate governance guidelines and related policies and procedures, including with respect to communications with stockholders, and, as appropriate, will recommend changes to the Board for its consideration."

## BREACHES OF DUTIES

109. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as fiduciaries of C3, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

110. The Individual Defendants breached their duties of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding, *inter alia*, the size of the Company's salesforce and the health of its partnership with Baker Hughes. The Individual Defendants also breached their duties of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused C3 substantial damage.

111. Moreover, the Insiders breached their duties of loyalty and good faith by using the Company's proprietary information for personal gain, as described herein.

112. Each Defendant owes to the Company and its investors the fiduciary duty to exercise loyalty and good faith in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as fiduciaries, the Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations. Egregiously, the Insiders not only traded the Company's stock while they knew the stock price

was artificially inflated, but several of them also made statements causing the stock price to become inflated.

113.    The Individual Defendants, because of their positions of control and authority as officers, directors, and/or controlling stockholders of C3, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the Insiders from engaging in insider trading. In addition, because of the Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws, as well as at least one other derivative lawsuit. As a result, C3 has expended, and will continue to expend, significant sums of money.

114.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as fiduciaries of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

115.    The Individual Defendants breached their duties of loyalty and good faith by violating the Company's Code of Ethics and the Company's Insider Trading Policy and trading in the Company's stock on the basis of MNPI as set forth above.

## DAMAGES TO C3

116.    The deficient internal controls that led to the issuance of materially false and misleading statements regarding the Company's joint venture with Baker Hughes and the size of C3's salesforce, among other things, have exposed the Company to reputational and financial damages including, but not limited to:

  (a) Potential liability arising from the Federal Securities Class Action;

(b) Potential increases in director and officer insurance premiums;

(c) The loss of credibility with customers, investors, and suppliers; and

(d) Legal and accounting costs associated with litigation, investigations, and restatements.

117.    Defendants took advantage of the MNPI to the detriment of the Company and its stockholders when the Insiders sold stock based at least in part on MNPI. This information was a proprietary asset belonging to C3, which was usurped for the benefit of the Defendants and to the detriment of the Company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

118.    Plaintiff brings this action derivatively and for the benefit of C3 to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of C3, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

119.    C3 is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiff is, and has been a stockholder of C3 during the wrongdoing complained of herein. Plaintiff will adequately and fairly represent the interests of C3 in enforcing and prosecuting its rights and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

121.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing this action, the Board consists of the following nine directors:  (i) Siebel; (ii) Davis; (iii) Levin; (iv) McCaffery; (v) Rice; (vi) Sewell; (vii) Snabe; (viii) Ward; and (ix) non-party KR Sridhar. Plaintiff needs only to allege demand futility as to five of the nine of the directors who are on the Board at the time this action is commenced.

122.    Demand is excused as to all eight of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

123.    In complete abdication of their fiduciary duties, Defendants Siebel, Davis, Levin, McCaffery, Rice, Sewell, Snabe, and Ward either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, Defendants Siebel, Davis, Levin, McCaffery, Rice, Sewell, Snabe, and Ward breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

124.    Moreover, in 2021, Defendant Siebel reaped more than $600 million by selling C3 stock on the basis of MNPI. Similarly, Defendant Rice obtained nearly $10 million from sales of C3 stock based on MNPI, while Defendant Levin made more than $11 million from inside trading. In March 2021 alone, Defendant McCaffery reaped over $16.5 million by selling shares of C3 common stock on the basis of MNPI. Similarly, Defendant Sewell reaped over $3 million based on the sale of C3 stock on the basis of MNPI in March 2021. Finally, Defendant Ward sold shares of C3 stock on the basis of MNPI between March 2021 and July 2021, reaping over $16 million in proceeds. Collectively, these six directors reaped *over $650 million* by selling C3 stock on the basis of MNPI. These are facially material benefits.

125.    As such, Plaintiff is excused from making a demand upon defendants Siebel, Rice,

Levin, McCaffery, Sewell, and Ward, who collectively constitute a majority of the Board.

126.    With regard to Defendant Siebel, the timing and size of his sales of C3 stock suggests that he was motivated to trade while the Company's stock was artificially inflated and before the MNPI was revealed to the public.  On March 8, 2021, the first day that the "early bird" lockup expired, Siebel sold nearly $200 million worth of C3 stock.  By June 7, 2021—the date on which the traditional 180-day lockup would have expired—Defendant Siebel's insider trading had earned him more than $350 million in ill-gotten gains. Moreover, while Defendant Siebel made approximately 11 transactions in C3 stock between March 8, 2021 and November 15, 2021, Defendant Siebel has not made any sales of C3 stock since the truth about the Company was revealed to the market.

127.    Demand on Defendant Siebel is further futile because he signed the Registration Statement, as well as various other quarterly and annual filings with the SEC, and made various misrepresentations in Company press releases and during the Company's earnings calls held during the Relevant Period. As the CEO of the Company, and having spoken on the subjects at issue for years, Defendant Siebel either knew, or was deliberately reckless in not knowing, that the statements he made were false and misleading and omitted material information. Accordingly, Defendant Siebel personally made the false and misleading statements described herein and omitted material information, and thus faces a substantial likelihood of liability. Accordingly, Plaintiff is excused from making a demand on Defendant Siebel for these reasons as well.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duty

128.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth herein.

129.    The Individual Defendants owe the Company fiduciary obligations. By reason of

their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

130.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

131.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

133.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits and severe damage to the share price of the Company, resulting in an increased cost of capital.

## SECOND CLAIM
### Against the Insiders for Breach of Fiduciary Duty by Insider Trading

134.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth herein.

135.    The Insiders, as officers and directors of the Company, owed C3 duties of loyalty, good faith, and care. This includes the duty not to trade in the Company's stock on the basis of MNPI. Nevertheless, the Insiders traded in the Company's stock while in possession of the MNPI

described herein.

136. As the Company's fiduciaries, the Insiders had access to and knew MNPI regarding, *inter alia*, the health of the Company's partnership with Baker Hughes, the size of the Company's salesforce, the pace of the Company's market growth, and the scale of C3's alliances with its major business partners.

137. As a direct and proximate result of the Insiders' misconduct, the Company has sustained significant damages, as alleged herein.

138. Plaintiff, on behalf of C3, has no adequate remedy at law.

### THIRD CLAIM
**Against the Insiders for Unjust Enrichment**

139. Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth herein.

140. Each of the Insiders traded in the Company's securities while in possession and on the basis of MNPI, as described above, thus damaging the Company.

141. It is unconscionable and against the fundamental principles of equity and good conscience for the Insiders to retain their ill-gotten gains under the circumstances described above.

### FOURTH CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

142. Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth herein.

143. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegations of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

144.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

145.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

146.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxy including, but not limited to, election of directors and the ratification of an independent auditor.

147.    The false and misleading elements of the annual Proxy led to the re-election of Defendants Siebel, House, and Sastry, allowing them to continue breaching their fiduciary duties to C3.

148.    The Company was damaged as a result of the Individual Defendants' material

misrepresentations and omissions in the Proxy.

149.     Plaintiff, on behalf of C3, has no adequate remedy at law.

## FIFTH CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

150.     Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth herein.

151.     The Individual Defendants, by virtue of their positions with C3 and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of C3 and officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause C3 to engage in the illegal conduct and practices complained of herein.

152.     Plaintiff, on behalf of C3, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of C3 and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached their fiduciary duties to the Company;

C.     Determining and awarding to C3 the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.     Directing C3 and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and

protect C3 and its stockholders from a repeat of the damaging events described herein;

E.      Awarding to C3 restitution from the Individual Defendants for their ill-gotten gains;

F.      Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accounts' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable.

                                                    ASHBY & GEDDES, P.A.

*Of Counsel:*                                        */s/ F. Troupe Mickler IV*
                                                    Stephen E. Jenkins (#2152)
Correy A. Suk                                       F. Troupe Mickler IV (#5361)
Gregory Mark Nespole                                500 Delaware Avenue, 8th Floor
Daniel Tepper                                       Wilmington, DE 19801
LEVI & KORSINSKY, LLP                               (302) 654-1888
New York, NY 10006                                  sjenkins@ashbygeddes.com
(212) 363-7500                                      tmickler@ashbygeddes.com
ckamin@zlk.com
gnespole@zlk.com
dtepper@zlk.com                                     *Counsel to Plaintiff*

Dated:  April 19, 2023